# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| NICOLE METE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 14 C 4169 |
| v. | ) |
| | ) |
| SEARS HOLDINGS CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

On June 5, 2014, Plaintiff Nicole Mete ("Mete") brought the present three-count Complaint against her former employer Defendant Sears Holdings Corporation ("Sears") alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.* Before the Court is Defendant's motion to compel arbitration and stay the present proceedings brought pursuant to 9 U.S.C. § 3. For the following reasons, the Court denies Defendant's motion.

**BACKGROUND**

Mete began her employment as a recruiter with Sears in February 2010 and resigned from Sears in May 2013. (R. 1, Compl. ¶¶ 4, 7.) Sears is a retail operation with over 2,600 full-line and specialty retail stores and operates through its subsidiaries, including K-Mart Corporation. (*Id.* ¶ 5.) Although she was based in Illinois, Mete was responsible for recruiting management for K-Mart stores in her assigned region, which included California, Oregon, Washington, and later North and South Dakota. (*Id.* ¶ 7.) Given the nature of Mete's role, she

often worked from home where she could perform virtually every function of her job. (*Id*. ¶ 8.) Mete's work schedule was similar to other recruiters, who also worked primary from home. (*Id*. ¶ 9.)

Further, Mete alleges that after she announced her pregnancy and need for FMLA leave, her supervisors told her that when she returned from maternity leave, she would be required to work in the office four days a week. (*Id*. ¶ 10.) When Mete questioned her supervisors why she was "singled out," her supervisors said they were going to talk to all recruiters about requiring them to work at Sears' headquarters in Hoffman Estates, Illinois. (*Id*. ¶ 11.) Mete, however, maintains that this statement was false and that Sears never required other recruiters who lived a commutable distance from headquarters to work at the Sears' headquarters. (*Id*.) According to Mete, Sears ultimate response was that these other recruiters were "grandfathered." (*Id*. ¶ 12.)

Mete began her maternity leave in early March 2013 hoping that Sears would reconsider its decision requiring her to work from its headquarters. (*Id*. ¶ 13.) Despite her concerns, Mete prepared to return to work and arranged for in-home child care. (*Id*. ¶ 14.) Also, Mete talked to one of her supervisors on the phone prior to her return to work and expressed her concerns, yet Sears refused to allow her to return to her prior work schedule, which included working from home four days a week. (*Id*. ¶ 15.) Mete thus alleges that she was forced to resign in May 2013 due to the drastic change in her job and the financial impact it would cause. (*Id*.)

During the week of April 2, 2012, Sears introduced an arbitration policy/agreement ("Arbitration Agreement" or "Agreement") to its employees, that states in relevant part:

> Under this Agreement, and subject to certain exceptions specified within the Agreement, all employment-related disputes between you ("Associate") and Company that are not resolved informally shall be resolved by binding arbitration in accordance with the terms set forth below. This Agreement applies equally to

> disputes related to Associate's employment raised by either Associate or by Company.
>
> ....
>
> Except as it otherwise provides, this Agreement applies, without limitation, to disputes regarding the employment relationship, trade secrets, unfair competition, compensation, pay, benefits, breaks and rest periods, termination, discrimination, or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, American With Disabilities Act, Age Discrimination in Employment Act, as amended, Family and Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act, Genetic Information Non-Discrimination Act, and any and all state statutes addressing the same or similar subject matters, and all other state or federal and common law claims ("Covered Claims").

(R. 18-1, Ex. 1, Arbitration Policy/Agreement, at 1). The Agreement contains an opt out provision:

> If Associate does not wish to be bound by the Agreement, Associate must opt out by following the steps outlined in this Agreement within 30 days of receipt of this Agreement. Failure to opt out within the 30-day period will demonstrate Associate's intention to be bound by this Agreement and Associate's agreement to arbitrate all disputes arising out of or related to Associate's employment as set forth below.

(*Id.*)

In response to Sears' motion to compel arbitration, Mete contends that the she did not receive, acknowledge, or review the Arbitration Agreement, and thus cannot be bound by it.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA"), specifically 9 U.S.C. § 2, "embodies both a 'liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Gore v. Alltel Comm'cns, LLC,* 666 F.3d 1027, 1032 (7th Cir. 2012); *see also Continental Cas. Co. v. American Nat'l Ins. Co.,* 417 F.3d 727, 730-31 (7th Cir. 2005) (the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements")

(citation omitted).  "[B]ecause arbitration is a matter of contract, 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Gore*, 666 F.3d at 1032 (citation omitted).  Instead, "courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms." *Id.* (quoting *AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011)).  "When deciding whether the parties agreed to arbitrate a certain matter, courts generally should apply ordinary state-law principles that govern the formation of contracts." *Druco Rest., Inc. v. Steak N Shake Enterp., Inc.*, 765 F.3d 776, 781 (7th Cir. 2014).  "Once it is clear, however, that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore,* 666 F.3d at 1032.

When the existence of an arbitration agreement between the parties is in dispute, courts must proceed to a jury trial unless the party alleged to be in default does not demand a jury trial, thus allowing the court to determine the issue.  *See* 9 U.S.C. § 4; *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 509-10 (7th Cir. 2003).  "The FAA does not expressly identify the evidentiary standard that a party attempting to avoid compelled arbitration must meet," nevertheless, "[m]ost Circuit Courts of Appeals that have examined the issue, including the Seventh Circuit, have analogized the standard to be applied when adjudicating the validity of an arbitration agreement to the standard imposed on a party opposing a motion for summary judgment." *Johnson v. Orkin, LLC,* 928 F.Supp.2d 989, 1001 (N.D. Ill. 2013) (listing cases).  Specifically, "[t]he party opposing arbitration must identify a triable issue of fact concerning the existence of the agreement in order to obtain a trial on the merits of the contract." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002).  "A party cannot avoid arbitration, however, merely by putting

4

forward a general denial of the facts upon which the right to arbitrate rests; rather, the party opposing compelled arbitration must identify specific evidence in the record demonstrating a genuine issue of material fact for trial." *Johnson,* 928 F.Supp.2d at 1001.

## ANALYSIS

In its motion to compel arbitration, Sears contends that on April 2, 2012, Dean Carter, Vice President of Talent and Human Capital Services, and Jeff Eich, Chief Compliance Officer and Associate General Counsel, sent an email entitled "Sears Holdings Arbitration Policy/Agreement and Social Media Policy Acknowledgments" to all Sears associates with an active Sears email account, including Mete. (R.18-2, Kaselitz Decl. ¶¶ 7, 11.) The April 2, 2012, email specifically stated: "Beginning this year, all associates are required to acknowledge their understanding of, and agreement with, the terms outlined in the Sears Holdings Arbitration Policy/Agreement." (*Id.* ¶ 7.) Sears further asserts that it maintains various personnel records using a Human Resources Management System known as "PeopleSoft," which tracks employee information, including whether employees receive certain company policies. (R. 18-3, Torrence Decl. ¶ 3.)

During 2012, Sears employees, including Mete, were able to log onto Sears' "My Personal Information" ("MPI") online portal and the training system known as the "Online Performance Training System" to view various Sears' policies and complete training. (Kaselitz Decl. ¶ 4.) The April 2, 2012, email asked employees, including Mete, to log onto the MPI portal to review and acknowledge receipt of the Agreement and Sears' social media policy. (*Id.* ¶ 8.) On July 20, 2012, Mete acknowledged receipt of the social media policy through the MPI portal, but she failed to acknowledge receipt of the Agreement. (*Id.* ¶ 12.)

5

Thereafter, in September or October 2012, Sears generated a list of employees who had not acknowledged receipt of the Agreement, including Mete. (Torrence Decl. ¶ 9.) Sears provide this list to a third-party vendor, Xerox, to print, address, and send a form letter prepared by Sears notifying these employees of the Agreement's terms and a copy of the Agreement itself. On October 31, 2012, Xerox mailed this letter and the Agreement pursuant to its standard business practices to the list of Sears employees, including Mete. (R 18-4, Claycomb Decl. ¶¶ 13, 14.) In particular, Xerox mailed the letter and Agreement to Mete at 745 W. 15th Street, Chicago, Illinois 60607, which was the home address Mete provided to Sears. (Torrence Decl. ¶ 18; Claycomb Decl. ¶ 13.)

Each of the October 31, 2012, form letters contained a unique bar code in the top left corner that Xerox used to track letters that were returned as undeliverable. (Torrence Decl. ¶ 11; Claycomb Decl. ¶ 14.) The United States Postal Service did not return Mete's letter as undeliverable, and at no time did Mete notify Sears that she wanted to opt out of the Agreement. (Torrence Decl. ¶ 19; Claycomb Decl. ¶ 15.) Accordingly, Sears updated Mete's status in PeopleSoft from "Available" to "Mailed-Bound" to reflect that Xerox, on behalf of Sears, had mailed Mete the notice of the Agreement, the notice had not been returned as undeliverable, and Mete had declined to opt out of the Agreement within the requisite 30 days. (Torrence Decl. ¶ 20.)

In response, Mete argues that there is no valid contract under the circumstances because she did not receive the Arbitration Agreement by email or regular mail, therefore, there was no offer in the first instance. *See National Prod. Workers Union Ins. Trust v. Cigna Corp.,* 665 F.3d 897, 901 (7th Cir. 2011) ("Under Illinois state law, an enforceable contract requires an offer,

6

acceptance, consideration, and mutual assent."). In particular, Mete argues that she did not receive the Agreement via email because it is undisputed that she never acknowledge receipt of the Agreement. To clarify, Mete relies upon the evidence provided by Sears, set forth above, that she never acknowledged the receipt of the Agreement, as underscored by Sears sending her the Agreement through regular mail on October 31, 2012. Although Mete did not acknowledge receiving the Agreement, she did acknowledge Sears' social media policy that was discussed in the same April 2, 2012, email as the Agreement.

In any event, Mete denies receiving the Arbitration Agreement and letter via United States Postal Service, which, as explained above, contained a unique bar code in the top left corner so Xerox could track the letters returned as undeliverable. Here, it is undisputed that the United States Postal Service did not return Mete's letter as undeliverable, and it is well-established "that evidence of proper mailing raises a rebuttable presumption of delivery." *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 476 (7th Cir. 2009) (collecting cases).

Mete's denial of receiving the Arbitration Agreement, without more, does not rebut the presumption in favor of the receipt. *See In re Longardner & Assoc.,* 855 F.2d 455, 459 (7th Cir. 1988). Here, however, Mete has done more than generally deny the receipt of the Agreement. Specifically, to rebut the presumption that the United States Postal Service delivered the Agreement, Mete sets forth specific evidence, namely, she avers that although Sears was supposed to send her 2013 W-2 to her to the same home address on record, she did not receive her 2013 W-2. (*Id.* ¶ 9.)[1] Mete also presents evidence of a text message dated February 22,

---

[1] The Seventh Circuit has repeatedly rejected the argument that plaintiffs may not rely on "self-serving" evidence to create a material factual dispute. *See Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013).

7

2014, from a Sears employee about Mete's 2013 W-2 and whether it was mailed. (R. 21, Ex. A.) Construing the facts and all reasonable inferences in her favor, Mete has set forth evidence that because she did not receive her 2013 W-2 in the mail, she did not receive the Arbitration Agreement in the mail —raising an issue of fact regarding the rebuttal of the presumption of delivery. *See Tinder*, 305 F.3d at 735 ("the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.") (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Moreover, there is no evidence in the record regarding the other elements of a valid contract under Illinois law, namely, acceptance, consideration, and mutual assent. *See National Prod. Workers Union,* 665 F.3d at 901. Therefore, there is a genuine issue of material fact whether the parties entered into the Arbitration Agreement at issue. *See Tinder,* 305 F.3d at 735; *Johnson,* 928 F.Supp.2d at 1001.

## CONCLUSION

For the stated reasons, the Court denies Defendant's motion to compel arbitration and stays this matter pursuant to 9 U.S.C. § 3.

**Dated:** November 21, 2014

ENTERED:

**AMY J. ST. EVE**
**United States District Court Judge**

8